UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                     Plaintiff,

        -against-

THE TOWN OF OYSTER BAY and TOWN
SUPERVISOR JOHN VENDITTO, in his
official capacity,

                    Defendants.
----------------------------------------------------------X

**MEMORANDUM OF DECISION & ORDER**
14–CV–2317 (ADS)(SIL)

**APPEARANCES:**

**United States Attorneys Office**
*Attorneys for the Plaintiff*
271 Cadman Plaza East
Brooklyn, NY 11201-1820
        By: Michael.Goldberger, Assistant U.S. Attorney
            Thomas A. McFarland, Assistant U.S. Attorney

**United States Department of Justice, Civil Rights Bureau**
*Attorneys for the Plaintiff*
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
        By: Neta Borshansky, Trial Counsel
            Beth Susan Frank, Trial Counsel

**Covington & Burling LLP**
*Attorneys for the Defendants*
1201 Pennsylvania Avenue N.W.
Washington, DC 20004
        By: Anthony Herman, Esq.
            Christopher Yuk Lun Yeung, Esq.
            Matthew Berns, Esq., Of Counsel

**SPATT, District Judge**.

On April 10, 2014, the United States (the "Plaintiff") commenced this action against the Town of Oyster Bay and the Town Supervisor John Venditto, in his official capacity (collectively, the "Defendants"). The Plaintiff asserts claims under the Fair Housing Act, 42 U.S.C. § 3601, *et seq* (the "FHA") and alleges that the Defendants engaged in, and continue to engage in, a pattern or practice of discrimination against African Americans through the use of two affordable housing programs. The Defendants have filed a motion to dismiss and fact discovery has not yet commenced.

Presently before the Court is the Defendants' motion to stay all proceedings in this action pending the decision of the Supreme Court in Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc., No. 13–1371, 135 S. Ct. 46 (2014) ("Texas DHCA"). The question presented in Texas DHCA is whether disparate impact claims are cognizable under the FHA.

For the reasons set forth below, the Court denies the Defendants' motion.

**I. BACKGROUND**

The Defendant the Town of Oyster Bay ("Oyster Bay") is a locality in Nassau County, New York, which consists of sixteen unincorporated communities and eleven incorporated villages. (Compl. at ¶ 5.) The Town Council in Oyster Bay is responsible for approving new housing developments and making revisions to Oyster Bay's zoning code. (Id.) The Defendant John Venditto ("Venditto") is the Town Supervisor and Chief Executive Officer of Oyster Bay. (Id. at ¶ 6.) He was responsible for designing and drafting legislation to create the Next Generation and the Golden Age programs, the two affordable housing programs at issue in the instant case. (Id.)

## A. The Next Generation Program

On November 9, 2004, Oyster Bay's Town Council passed the Next Generation program. (Id. at ¶ 10.) This was a resolution that amended Oyster Bay's zoning code to offer developers incentives to build housing for first-time homebuyers with incomes between 80 and 120 percent of the median town income. (Id.) In exchange for building affordable Next Generation housing, developers would be permitted to build up to 12 units per acre, more than ordinarily permitted. (Id.)

The Town hired the Long Island Housing Partnership, Inc. ("LHIP") to administer and implement the program. (Id. at 13.) As administered, the program gives first priority to Oyster Bay residents and their children. (Id. at ¶ 11.) The stated purpose of the residency preference is to benefit young families who have ties to Oyster Bay. (Id.)

The Plaintiff alleges that when the resolution passed, the Defendant Venditto stated that the goal of the Next Generation program was to "keep our children here, keep the generations flowing in the Town." (Id. at ¶ 12.) Venditto allegedly added that "[b]y providing our young people with an opportunity to achieve the personal and financial stability that accompanies homeownership, we are helping ensure that our Town remains the best place to live and raise a family for present and future generations." (Id.)

On June 13, 2006, the Town Council approved the Seasons at Plainview, the first development built pursuant to the Next Generation program. (Id. at ¶ 15.) The development is comprised of approximately 134 units. (Id. at ¶ 15.) Of the 134 units, 28 units were to be devoted to affordable housing under the Next Generation program, and 106 units were not a part of the Next Generation program. (Id.) LHIP received approximately 2,000 applications for the

3

28 Next Generation units. (Id. at ¶ 16.) To decide the applicants that LHIU was going to give the opportunity to purchase the 28 Next Generation units, LHIU held a lottery. (Id. at ¶ 17.) The Plaintiff alleges that 240 applicants who were residents of Oyster Bay or children of residents of Oyster Bay were ranked ahead of the 29 non-resident applicants in the lottery. (Id.) As such, residents and children of residents of Oyster Bay were offered the opportunity to purchase the Next Generation units before non-residents. (See Id.)

According to the complaint, all 28 Next Generation units at the Seasons at Plainview were awarded to Oyster Bay residents. (Id.) Of those residents, the Plaintiff alleges that eighty-eight (88) percent were white and none were African Americans. (Id. at ¶ 21.)

In October 2007, the Town Council approved the Seasons at Massapequa, another development which included 30 Next Generation townhouses. (Id. at ¶ 19.) The Plaintiff alleges that LHIP determined that 147 of the applicants were eligible for the 30 Next Generation homes. (Id.)

LHIP also held a lottery to select buyers for the Next Generation units at the Seasons at Massapequa. (Id.) The Plaintiff alleges that 128 of the applicants who were residents of Oyster Bay or the children of residents of Oyster Bay were ranked ahead of 29 non-resident applicants. (Id.) The complaint does not make clear whether all of the individuals who won the lottery for the Next Generation units at the Seasons at Massapequa were residents or children of residents of Oyster Bay. However, according to the complaint, at least 28 of the 30 individuals who won the lottery at the Seasons at Massapequa were white families and none were African Americans. (Id. at ¶ 19.)

The Plaintiff alleges that when the lotteries for Next Generation units at both developments were held, African Americans constituted less than 1 percent of the families living

in Oyster Bay who were income eligible to purchase housing through the Next Generation program. (Id.) The Plaintiff further alleges that white families made up as much as 90 percent of the pool of eligible applicants for the Next Generation housing.

By comparison, the Plaintiff alleges that the population of Nassau and Suffolk Counties who would be eligible for the program was approximately 10 percent African American and between 70 and 75 percent white. Also, the eligible population in the New York City metropolitan area was approximately 20.5 percent African American and 48 percent white.

**B. The Golden Age Program**

In June 1993, Oyster Bay created the Golden Age housing program to encourage development of below-market rate housing for senior citizens. (Id. at ¶ 22.) Similar to the Next Generation program, the Golden Age program offers developers an incentive to build Golden Age housing units in the form of a zone variance permitting them to build more housing units. (Id.)

Moreover, similar to the Next Generation program, the Golden Age program gives preference to Oyster Bay residents. (Id. at ¶ 23.) In particular, the Plaintiff alleges that the program gives preference to applicants who have: (a) a residence in the Oyster Bay school district; (b) a residence in the Town of Oyster Bay; (c) a child who resides in the Oyster Bay school district; or (d) a child who resides in the Town. (Id.)

The Plaintiff alleges that "virtually all of the housing units developed under the Golden Age program have been purchased by whites who obtained their units pursuant to [the residency] preferences; only a handful, at most, have been purchased by African Americans." (Id. at ¶ 26.)

According to the complaint, at the time the Golden Age units were constructed, African Americans constituted between "zero percent and no more than four tenths of one percent of

5

families" living in Oyster Bay who were eligible to apply for units under the Golden Age program. (Id. at ¶ 25.) Also, the Plaintiff alleges that whites made up "as much as 99 [percent] of the pool of eligible families in the Town." (Id.)

By contrast, the Plaintiff alleges that the eligible senior citizen population in Nassau and Suffolk Counties was between 3 and 10 percent African American and approximately 86 percent white; and the eligible senior citizen population in the New York City metropolitan area was between 10 and 20 percent African American and between approximately 49 and 85 percent white. (Id. at ¶ 25.)

## II. DISCUSSION

### A. Legal Standard

A court may "may decide in its discretion to stay civil proceedings pursuant to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Laumann v. Nat'l Hockey League, No. 12 CIV. 1817 (SAS), 2013 WL 837640, at *2 (S.D.N.Y. Mar. 6, 2013) (quoting Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 96 (2d Cir. 2012) (internal quotation marks omitted); accord Landis v. N. Am. Co., 299 U.S. 248, 254, 57 S. Ct. 163, 166, 81 L. Ed. 153 (1936) ("Apart, however, from any concession, the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

On a motion to stay, it is the moving party's burden to establish "a clear case of hardship or inequity in being required to go forward." Trikona Advisors Ltd. v. Kai-Lin Chuang, No. 12-CV-3886 (JW), 2013 WL 1182960, at *2 (E.D.N.Y. Mar. 20, 2013) (quoting Landis, 299 U.S. at 255). The factors usually applied by courts in this Circuit when deciding a motion to stay a civil

action are: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." Id. (citing Kappel v. Comfort, 914 F.Supp. 1056, 1058 (S.D.N.Y. 1996)); see also Laumann, 2013 WL 837640 at *2 (same); Estate of Heiser v. Deutsche Bank Trust Co. Americas, No. 11 CIV. 1608 (MHD), 2012 WL 2865485, at *3 (S.D.N.Y. July 10, 2012) aff'd, No. 11 CIV. 1608 (AJN), 2012 WL 5039065 (S.D.N.Y. Oct. 17, 2012) ("This test has been applied to stay a federal action in light of a concurrently pending federal action . . . either because the claim arises from the same nucleus of facts or because the pending action would resolve a controlling point of law . . . .") (quoting SST Global Tech., LLC v. Chapman, 270 F. Supp. 2d 444, 445 (S.D.N.Y. 2003) (internal quotation marks and alterations omitted). In balancing these factors, "the basic goal is to avoid prejudice" to either party. Laumann, 2013 WL 837640 at *2 (quoting In re OxyContin Antitrust Litig., No. 10 Civ. 6038, 2012 WL 5184949 (SHS), at *6 (S.D.N.Y. Oct. 19, 2012) (internal quotation marks omitted).

Where a pending Supreme Court or an appellate court decision would be dispositive of the litigation, New York courts have found the above factors to weigh in favor of staying proceedings. See, e.g., Estate of Heiser v. Deutsche Bank Trust Co. Americas, 2012 WL 2865485 at *5 ("In recognition of the fact that the Second Circuit will likely be ruling on legal issues potentially dispositive in this case, it is in the best interest of this court to await the decision in the consolidated . . . appeals. Failure to do so could well lead to unnecessary litigation that is time-consuming for this court, as well as for any third parties that might be joined in this turnover proceeding."); In re Literary Works in Elec. Databases Copyright Litig.,

No. 00 CIV 6049 (GBD), 2001 WL 204212, at *3 (S.D.N.Y. Mar. 1, 2001) (granting motion to stay because although "a decision in the [case] before the United States Supreme Court 'may not settle every question of fact and law' before this [c]ourt," "in all likelihood it will settle many and simplify them all.").

By contrast, where a Supreme Court or an appellate court decision would not dispose of the main issues in the litigation, courts have found considerations of fairness and efficiency to weigh in favor of denying a stay of the proceedings pending the decision. See, e.g., Laumann, 2013 WL 837640 at *2 ("Thus, while [the] Defendants may be correct that a reversal in AMEX III could ultimately 'drastically reduce [their] liability' by eliminating certain classes of claims against them, they have offered no evidence that their role in the pretrial proceedings scheduled between now and the likely issuance of a decision by the Supreme Court would be significantly impacted by the outcome in AMEX III."); In re Tremont Sec. Law, State Law, & Ins. Litig., No. 08 CIV. 11117 (TPG), 2013 WL 4730263, at *4 (S.D.N.Y. Sept. 3, 2013) ("Therefore, absent any showing that [the] plaintiffs will face any special hardship in proceeding before the Troice cases are decided, the court is not willing to stay the resolution of dispositive motions in this case on the mere possibility that the Supreme Court may announce a rule that is both relevant and contrary to this court's own holdings.").

**B. As to Whether the Defendants' Motion to Stay Should be Granted**

The sole question certified by the Supreme Court in Texas DHCA is whether "disparate-impact claims [are] cognizable under the Fair Housing Act." See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc., No. 13–1371, 135 S. Ct. 46 (2014); see also Pet. for Writ of Cert., the Defs' Opening Br., Ex. A.

8

The Defendants argue that the Plaintiff's FHA claims rely solely on a theory of disparate-impact and therefore Texas DHCA may be dispositive of the instant litigation. (The Defs.' Opening Br. at 1.) As such, the Defendants argue that a stay is appropriate because of the possibility that the time and expense incurred in conducting fact discovery until the resolution of the Supreme Court decision may be a waste, which should be given special significance here because both parties are government entities funded by the taxpayers. (The Defs.' Opening Br. at 1.) The Defendants further argue that any prejudice to the Plaintiff by the stay would be minimal because the stay would likely only last until June 2015, when the Supreme Court will likely issue its decision in Texas DHCA. (Id. at 3.)

In response, the Plaintiff argues that Texas DHCA would not be dispositive of the instant litigation because the Plaintiff's claims rest on theories of disparate-impact and intentional discrimination. (The Pls.' Br. at 4.) Therefore, even if the Supreme Court were to rule that disparate-impact claims are not cognizable under the FHA, proceeding with the litigation on schedule would not lead to wasteful pre-trial activity as the Plaintiff's intentional discrimination theory would still be viable. (Id. at 5.)

Accordingly, the first question the Court must consider is whether the complaint can be fairly read to assert a claim of intentional discrimination under the FHA or whether, as the Defendants contend, it can only be read to assert a claim of disparate impact. In determining whether the Plaintiff's allegations could plausibly be read to support an inference of intentional discrimination, the Court will apply the plausibility standard applicable to motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a complaint must plead "enough facts to state a claim to relief that is plausible on

its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted).

"Intent to discriminate may be established in a number of ways." United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1221 (2d Cir. 1987). Although evidence of a disparate impact alone is not sufficient to show an intent to discriminate, "[s]uch impact may be an important starting point." Id. Other relevant factors that can lead to an inference of intentional discrimination are the (i) "historical background"; (ii) "the specific sequence of events leading up to the challenged decision[,] such as zoning changes for a given site enacted upon the decisionmaker's learning of plans for the construction there of integrated housing"; (iii) "contemporary statements by members of the decisionmaking body"; or (iv) "[d]epartures from the normal procedural sequence." Id. (quoting Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S. Ct. 555, 564, 50 L. Ed. 2d 450 (1977)); see also Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) ("An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent . . . A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." ).

Weighing the Plaintiff's allegations in their totality, the Court concludes that the Plaintiff has pled enough facts to plausibly state a claim for intentional discrimination under the FHA. The Plaintiff alleges that between zero and one percent of African American residents of Oyster Bay were eligible for affordable housing units in the Golden Age and New Generation programs,

10

while white residents comprised between ninety and ninety-nine percent of the eligible pool for both programs. (The Compl. at ¶¶ 20, 25.) In addition, the Plaintiff alleges that "virtually all" of the housing units developed under the Golden Age and New Generation programs have been purchased by white individuals pursuant to their residential preferences. (Id. at ¶ 26.) Therefore, these statistics tend to plausibly establish that the preference given to Oyster Bay residents under both programs has had a disparate impact on African Americans. See Washington v. Davis, 426 U.S. 229, 242, 96 S. Ct. 2040, 2048-49, 48 L. Ed. 2d 597 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including . . . the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact in the jury cases for example, the total or seriously disproportionate exclusion of Negroes from jury venires may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds."); Floyd v. City of New York, 959 F. Supp. 2d 540, 571-72 (S.D.N.Y. 2013), appeal dismissed (Sept. 25, 2013) ("The consequences of government action are sometimes evidence of the government's intent: 'proof of discriminatory intent must necessarily usually rely on objective factors . . . The inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid.'") (quoting Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279 n. 24, 99 S.Ct. 2282, 60 L. Ed. 2d 870 (1979).

Further, the complaint alleges that the Defendant Venditto, who was responsible for both programs, stated that the goal of the Next Generation program was to "keep our children here, keep the generations flowing in the Town" and that "[b]y providing our young people with an opportunity to achieve the personal and financial stability that accompanies homeownership, we

11

are helping ensure that our Town remains the best place to live and raise a family for present and future generations." (Compl. at ¶ 12.) In light of the significant statistical disparities alleged with respect to the African American applicants, the Court concludes that a jury could plausibly read the references to "our children" and "our young people" to suggest a discriminatory motive.

Therefore, based on the totality of the Plaintiff's allegations, the Court concludes that the complaint does, at this early stage of the litigation, plausibly suggest a viable claim of intentional discrimination under the FHA. See Fair Hous. Justice Ctr., Inc. v. Silver Beach Gardens Corp., No. 10 CIV. 912 (RPP), 2010 WL 3341907, at *4 (S.D.N.Y. Aug. 13, 2010) (finding that a plaintiff stated a claim for intentional discrimination under the FHA based on the "policy itself, and its enforcement, with accommodations for white prospective buyers and none for African American prospective buyers."); ACORN v. Cnty. of Nassau, No. 05-CV-2301 (JFB), 2006 WL 2053732, at *2, 11 (E.D.N.Y. July 21, 2006) (denying a motion to dismiss an intentional discrimination claim under the FHA based on allegations that the defendant Nassau County and Garden City developed affordable housing in predominantly minority and low-income areas of Nassau county "with the purpose of perpetuating racial and ethnic housing segregation throughout Nassau County.").

Accordingly, the expense and time involved in permitting discovery to proceed on schedule would not prejudice the Defendant because even if the Supreme Court decides in Texas DHCA that a disparate impact theory is not actionable under the FHA, the Plaintiff's intentional discrimination claim may still be viable. As such, any expenses incurred with proceeding with the litigation on schedule would not be a waste. To the contrary, under the circumstances, "staying the case would merely delay litigation and likely result in greater inefficiencies to the

Court and litigants." Laumann v. Nat'l Hockey League, No. 12 CIV. 1817 (SAS), 2013 WL 837640, at *3 (S.D.N.Y. Mar. 6, 2013).

Therefore, the Court, in its discretion, finds that a stay of the proceedings would not serve the interests of fairness or efficiency and is not warranted. In re OxyContin Antitrust Litig., No. 04-MD-1603 SHS, 2012 WL 5184949, at *6 (S.D.N.Y. Oct. 19, 2012) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.") (quoting Landis v. N. Am. Co., 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936)).

### III. CONCLUSION

For the foregoing reasons, the Defendants' motion to stay the proceedings until the Supreme Court renders a decision in Texas DHCA is denied.

**SO ORDERED.**
Dated: Central Islip, New York
December 5, 2014

_/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge